IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

**BENJAMIN GOMEZ,**                                     Civil No. 09-869-SU

         Plaintiff

    v.                                                        **FINDINGS AND**
                                                                  **RECOMMENDATION**
**MICHAEL J. ASTRUE,**
Commissioner of Social Security

         Defendant.

Sullivan, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Benjamin Gomez ("Gomez"), seeks judicial review of the Social Security

Commissioner's ("Commissioner") final decision denying his application for Disability Insurance

1 - FINDINGS AND RECOMMENDATION

Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 401-33, 381-83(f).  This court has jurisdiction under 42 U.S.C. §§ 405(g)

and 1383(c).  For the reasons set forth below, the Commissioner's decision should be reversed and

remanded for the immediate calculation and award of benefits.

## ADMINISTRATIVE HISTORY

Gomez filed for SSI on March 2, 2005 (Tr. 913A-913E[1]) and for DIB on March 18, 2005.

Tr. 62.  Gomez alleges that his disability began on January 10, 2005.  Tr. 62, 913A.  The

Commissioner denied Gomez's applications initially and upon reconsideration.  Tr. 25-29, 913F-

913J.

An Administrative Law Judge ("ALJ") held a hearing on February 9, 2007.  Tr. 914-39.  On

April 13, 2007, the ALJ found Gomez not disabled.  Tr. 18-24.  The Appeals Council accepted

additional evidence into the record (Tr. 4A), but denied review of the matter, making the ALJ's

decision the final decision of the Commissioner.  Tr. 5-7.  Gomez appeals.

## BACKGROUND

Gomez was born in 1953 and was 54 years old at the time of the hearing and decision.

Tr. 917.  He completed the tenth grade and part of the eleventh grade in school.  Tr. 92.  Gomez

was married for ten years and has grown children. Tr. 382.  He served in the military from 1973

until 1976. Tr. 62.  Gomez has work experience as a groundskeeper, janitor, and bus driver.  Tr.

94.  He was laid off from his last job in December, 2004. Tr. 88.  Gomez was injured in a car

accident on January 10, 2005, which is the date of the onset of his alleged disabilities. Tr. 62.

---

[1]Citations "Tr." refer to indicated pages in the official transcript of the administrative
record filed with the Commissioner's Answer on December 16, 2009 (Docket # 9).

As a result of the accident, he suffered fractures to his left wrist, right hip, ribs, and collar bone. Tr. 87.  He alleges that he is unable to work due to the injuries he suffered in the accident.  He claims also to suffer from pain as well as psychological problems as a result of his injuries. Tr. 151.

## I.    Claimant's Testimony

### A.    March 21, 2005, Disability Report

On his March 21, 2005, disability report, submitted in conjunction with this initial application, Gomez stated that he was disabled due to a car accident causing a broken left wrist, broken right hip, broken ribs, and broken collar bone.  Tr. 87.  Gomez stated that these injuries left him "unable to do anything physical," and that he can't sit or stand for long periods of time. Tr. 88.

### B.    March 28, 2005, Function Report

Gomez completed a "Function Report" for the Commissioner on March 28, 2005.  Tr. 109-09.  Gomez wrote that, as of March 28, 2005, "I try and cook.  Try and clean, try and exercise, try to sleep, take pain pills." Tr. 102.  Gomez reported that "everything" causes him pain, and that he could not sleep due to pain on the right side of his body.  Tr. 103.  Gomez stated that he used tools to dress, used a chair to bathe, could shave and eat with only one hand, and that he had to sit and bend in order to use the toilet.  Tr. 103.

Gomez also wrote that he prepared frozen dinners and canned food, which took him a half hour.  Tr. 104.  He found household chores "hard" but did them all day, twice a week.  Tr. 104.  Gomez used public transportation because he did not have a car, and shopped for food and cleaning supplies twice a month.  He was able to pay bills and use a bank account.  Tr. 105.

Gomez watched television every day and went to a community center.  Tr. 106.

Gomez indicated difficulty lifting, walking, stair climbing, squatting, sitting, bending, kneeling, using his hands, standing, and reaching.  Tr. 107.  Gomez wrote that these limitations were due to his hip and left hand impairments.  *Id.*  Gomez reported that he could walk one block, and after this must rest ten minutes before resuming walking.  *Id.*  Gomez stated that he could pay attention for long periods and had "good" abilities to follow written and spoken instructions and interact with authority figures.  Tr. 107-08.

Finally, Gomez stated that, as of March 28, 2005, he used a walker and brace or splint "all the time," and that these were prescribed on January 10, 2005.  Tr. 108.

### C.    March 28, 2005, Personal Pain Questionnaire

Gomez also completed a "Personal Pain Questionnaire" on March 28, 2005.  Tr. 110-13. Gomez stated that, as of March 28, 2005, his hip caused pain "all the time" and that it worsened with cold weather, and movement, standing, or sitting.  Tr. 110.  Gomez reported that the pain was located in his hip, knee, wrist, and the whole right side of his body.  *Id.*  He took ibuprofen three times per day and acetaminophen four times per day.  Tr. 110.  Other treatment for his pain included hot showers, use of a "squeeze ball," and leg raises, although he wrote that these measures "don't work very well."  Tr. 111.

Gomez wrote that he could not work as of March 28, 2005, because of difficulties bending, dressing, and carrying.  *Id.*  He also wrote that his cooking ability is limited because he could only use one hand, and that he could not lift wet clothes when doing laundry, could not bend to clean floors, and could only use one hand in vacuuming, dusting, and scrubbing.  Tr. 111.  Gomez also stated that his sleep was affected by pain on his right side which woke him up

4 - FINDINGS AND RECOMMENDATION

at night.  *Id.*

### D.    May 9, 2005, Disability Report - Appeal

Gomez completed a second disability report in conjunction with his appeal on May 9,

2005.  Tr. 114-20.  He indicated that his condition had not changed since his previous disability

report, and stated that he had no new injuries, illnesses, or conditions.  Tr. 114.  Gomez also

indicated that he had not seen, and would not see, further doctors, hospitals, or clinics for his

illness or condition.  Tr. 115.  Gomez indicated that he had not seen, and would not see, a

doctor, hospital, or clinic for emotional or mental problems that limit his ability to work.  *Id.*

Gomez again wrote that he took acetaminophen and ibuprofen for pain, and citalopram

to "restore balance in the brain."  Tr. 117.  Side effects of these medications included nausea,

diarrhea, upset stomach, and headaches.  Finally, Gomez stated that he had difficulty lifting and

bending.  Tr. 118.

### E.    February 9, 2007, Hearing Testimony

Gomez testified at his February 9, 2007, hearing before the ALJ.  Tr. 917-33.  Gomez

first stated that he was fifty-four years old, and that he last worked in 2004 as ground

maintenance personnel.  Tr. 917.  He held that job for approximately six months prior to his

January 2005 automobile accident, and before this Gomez worked as a maintenance worker for

another employer.  Tr. 918.

Gomez also described his January 10, 2005, motor vehicle accident, explaining that he

was driving and blacked out, and subsequently recalled awakening in the hospital following a

head-on collision.  Tr. 918.  In response to questioning by the ALJ, Gomez stated that, as of his

February 9, 2007 hearing, he had not fully recovered from the effects of this collision.  Tr. 918.

5 - FINDINGS AND RECOMMENDATION

Gomez specifically stated that he is "still bothered" by headaches and his left shoulder, hip, and lower back.  Tr. 918-19.

Gomez explained that he had limited use of his left wrist, with reduced grip strength.  Tr. 919.   His right hand was unaffected, and he could still write and manipulate his fingers.  *Id.* Gomez testified that pushing or pulling with his left arm causes problems "most of the time" because he could not bend that arm back.  Tr. 919-20.  Gomez also testified that he could lift his left arm to shoulder height, and could not perform an action such as screwing in a light bulb due to his left hand constraints.  *Id.*

Gomez stated that he had migraine headaches "twice a month" (Tr. 920), and that these headaches last "probably about 10 minutes," but that there is nothing he can do to alleviate them.  Tr. 921.  Gomez further stated that the "slightest movement" exacerbated these headaches.  *Id.*  Gomez also stated that he had less severe headaches weekly, and that these headaches go away when he reclines and closes his eyes.  Tr. 921.

Gomez also testified that, as of his February 9, 2007, hearing, he recently had an operation on his right knee, and that his left knee now had "more" arthritis.  Tr. 922.  Gomez stated that he used a cane since his January 2005 accident.  *Id.*

Gomez also stated that, as of his February 9, 2007, hearing, he resided in the Veteran's Administration ("VA") domiciliary, where he performs a job.  *Id.*  To reach his workstation, he had to walk about two long blocks, or a quarter mile, within the domiciliary.  Tr. 923.   His job consisted of sitting in the gymnasium and making sure gym users replace equipment because "that's about all I can do."  Tr. 923.

Regarding his weight, Gomez stated that he gained approximately fifty pounds in the

two years before his February 2007 hearing, and that his extra weight interfered with exercise. Tr. 923-34.  His knee pain began before his weight gain.  Tr. 932.

Gomez stated that he could be on his feet approximately ten to fifteen minutes (Tr. 924), and that he must sit after crossing a room.  Tr. 925.  His sitting tolerance had improved a bit, and, as of his hearing, he could sit for approximately twenty minutes, rather than fifteen minutes (*id.*), although he leaves the domiciliary to go to movies.  Tr. 926.  Gomez testified it is "very, very difficult" for him to climb stairs.  *Id.*

Gomez stated that he could lift twenty or twenty-five pounds using his right hand, but "wouldn't even try" lifting weights with his left hand because of his left wrist impairment.  Tr. *Id.*  While a brace alleviated some pain in his left wrist, any lifting with his left hand was painful. Tr. 927.

Regarding his mental health, Gomez stated that he previously saw a counselor once a month, but at the time of his hearing saw a counselor once every two months, and hoped this change meant he was getting a little heathier.  *Id.*  Gomez thought he had achieved a little more balance mentally.  *Id.*  Gomez later stated that he saw the counselor for depression and that "I was suicidal."  Tr. 929.  Gomez explained that he was last suicidal a month ago, on his birthday, which was the anniversary of his automobile accident.  *Id.*  Gomez stated that he has one friend in the VA domiciliary, and that he has no plans for leaving the domiciliary.  Tr. 930.

When asked about his ability to perform a light, eight-hour per day, job, Gomez stated that he "couldn't tell you" how he would perform.  Tr. 928.  Gomez explained that he could no longer work as a bus driver because he is unable to sit for more than twenty minutes.  *Id.* Gomez also stated that his reduced ability to push and pull would interfere with his ability to

7 - FINDINGS AND RECOMMENDATION

drive. *Id.* Gomez stated that he could not perform work as maintenance personnel because he could not be on his knees or lift heavy equipment. Tr. 929.

Finally, Gomez stated that he took three ibuprofen, three times daily, and did not take stronger painkilling medication because the VA domiciliary would not allow it. Tr. 931.

## II.    Vocational Expert's Testimony

A vocational expert also testified at Gomez's February 9, 2007, hearing before the ALJ. Tr. 933-37. The vocational expert stated that Gomez's past relevant work as a bus driver, maintenance worker, and groundskeeper was medium work. Tr. 934. The ALJ asked the vocational expert to consider a hypothetical individual limited to frequently lifting and carrying no more than ten pounds, occasionally lifting and carrying no more than twenty pounds, lifting only very small items with his left arm with problems bending or twisting his left wrist, on his feet for fifteen minutes at a time, and able to change positions every twenty minutes, rarely able to climb stairs, unable to kneel or crawl, and occasionally able to stoop or crouch. Tr. 934. The ALJ also added that the hypothetical individual would be unable to walk or stand more than fifteen minutes. Tr. 935. The vocational expert responded that such an individual could not perform Gomez's past relevant work. *Id.*

The vocational expert subsequently testified that an individual with these limitations would be able to work as a counter clerk, but that this work would not be possible if the individual used a cane. Tr. 935. The vocational expert then stated that the hypothetical individual could work as a table worker, ticket taker, or parking lot cashier. Tr. 936. In response to questioning by Gomez's counsel, the vocational expert stated that a person could perform these jobs while using the left hand  as an "assist." *Id.*

8 - FINDINGS AND RECOMMENDATION

Gomez's counsel then asked the vocational expert if an individual could perform these jobs while additionally using a cane in the right hand. *Id.* The vocational expert responded that the jobs she listed allowed a person to sit. Tr. 937. Gomez's counsel further inquired whether an individual could perform these jobs if the individual were required to sit and stand, and if the individual required use of a cane for support. *Id.* The vocational expert responded that in this case "your hands are tied up and you're not going to be able to perform these duties," and that she was unsure any jobs would be available given these limitations. *Id.*

### III.   Medical Evidence

#### A.   Medical Evidence Before the ALJ

##### a.   2005

The medical record before this court begins with injuries Gomez sustained in a January 10, 2005, automobile accident. Tr. 307-09. Emergency room physicians assessed alcohol intoxication, scalp laceration, left wrist fracture, right hip fracture and dislocation, and multiple rib fractures. Tr. 306. Gomez received immediate emergency surgery on his pelvis and left wrist. Tr. 314. On January 11, 2005, Gomez also complained of right knee pain and an x-ray showed mild degenerative joint disease. Tr. 323.

Gomez was treated at Swedish Medical Center in Englewood, Colorado, both in the emergency room and for rehabilitation until January 19, 2005. Tr. 291-292. Upon discharge, Gomez was diagnosed with multiple traumas including left wrist fracture, right hip fracture with dislocation of the hip, forehead laceration, right-side rib fracture, nerve irritation in the right lower leg and foot, anemia, acute renal failure and ileus which had resolved, chronic obstructive pulmonary disease, and a history of alcohol abuse. Tr. 291. Gomez was transferred to a

Veterans Administration ("VA") rehabilitation facility in Denver, Colorado on January 19, 2005.  Tr. 279.

The VA rehabilitation consultations included physical therapy, occupational therapy, speech therapy, neuropsychology, and orthopedics.  Tr. 149.  The VA addressed multiple medical issues upon admission including the wrist and hip fractures, anemia, alcoholism, pain, elevated liver function, ileus, and depression.  Rehabilitation issues included mobility, activities of daily living, speech and social adjustment.  Tr. 150-152.  Gomez received a psychological evaluation on January 27, 2005, and psychologist Sheila Saliman, Ph.D., stated that while Gomez was alert and cheerful he endorsed depressive symptoms including sad/blue mood more often than not, weight loss, poor sleep, poor energy, no interest or enjoyment in anything except drinking alcohol, avoidance of people and situations, isolation, guilt and shame, and thoughts of suicide.  Tr. 231-32.  Gomez reported that he wanted to quit drinking, and that he might easily revert to poor coping skills when overwhelmed.  Tr. 231.  Dr. Saliman made no diagnostic conclusions, but said she would continue to speak with Gomez about his "options and coping styles."  Tr. 232.   On February 8, 2005, Dr. Saliman diagnosed depression and recommended treatment for alcoholism and depression. Tr. 194

Gomez received daily occupational and speech therapy between January 28, 2005, and February 8, 2005.  Tr. 179-228.   At his February 8, 2005, occupational therapy discharge Barbara Conroy, R.N., stated that Gomez had met rehabilitation goals and that Gomez's affect was bright and he offered no complaints.  Gomez was scheduled for outpatient follow-up for orthopedic appointments in February, 2005.  Conroy indicated that she would facilitate admission to an alcohol treatment program in White City, Oregon, post-discharge.  Tr. 179.

Gomez's diagnoses on his February 8, 2005, discharge from the VA hospital were right acetabular fracture, left forearm fracture, anemia, alcoholism, elevated liver function tests, depression, pain disorder with use of motrin and acetaminophen "as needed," and a rule-out diagnosis of traumatic brain injury. Tr. 150-51. Rehabilitation issues included mobility, activities of daily living, speech, and social adjustment. Tr. 152. He was discharged to his home with multiple aids including a walker, dressing stick, reacher, sock aid, bath transfer bench, and medications including ibuprofen for pain, citalopram for depression, and trazadone for insomnia. Tr. 186

Between February 8, 2005, and October 24, 2005, Gomez was not hospitalized nor in a rehabilitation facility. Other than a March 10, 2005, follow-up appointment with orthopedic surgeon Allen Bucknell, M.D., there are no medical records submitted for that period of time. Tr. 288. Gomez submitted his application for benefits on March 21, 2005, beginning the process that has culminated in this case.

On October 19, 2005, Gomez was admitted to VA Souther Oregon Rehabilitation Center in White City, Oregon. Tr. 758[2]. Upon admission, Gomez was assessed with constant pain in his right hip and the need to use a cane; he was actively taking citalopram for depression and etodolac for pain; he admitted to substance abuse issues. Tr. 759-762. Gomez began living in the VA domiciliary and sought a work assignment on October 24, 2006. Tr. 756. After a complete physical examination by Steven M. White, M.D., on October 24, 2005, Gomez was diagnosed with fifteen different problems including alcohol and substance abuse, obesity,

---

[2] The records from the VA in White City are voluminous including 450 pages of documentation regarding progress notes for Gomez.

fracture of right hip with resultant posttraumatic arthritis, posttraumatic arthritis and decreased range of motion of left wrist, posttraumatic arthritis of right knee which was service related, left ear hearing loss, substance abuse, and a mood disorder (depression) with history of suicide attempt. Tr. 767.   Psychology technician Betty Stockton performed a mental status examination on October 26, 2005, and indicated that Gomez's test results did not require psychological services at that time. Tr. 748.   However, Stockton identified limitations in physical functioning, work and usual activities, pain which interfered with functioning, as well as limitations in work and social activities due to emotional conditions.  Tr. 747.  On October 31, 2005, case manager Nora Mowatt, Licensed Practical Nurse ("L.P.N."), summarized Gomez's VA domiciliary treatment plan, stating that priorities were substance abuse treatment and employment.  Tr. 742.

Case manager Mowatt developed a treatment plan for Gomez on November 2, 2005, which Gomez understood and agreed to. Tr. 465.  The plan focused on substance abuse and development of job skills.  *Id.*  Mowatt noted that Gomez could not perform any past relevant work as a bus driver due to his DUI convictions.  Tr. 464.

Gomez received a VA domiciliary work assignment on November 14, 2005. Tr. 673. Gomez attended group therapy on November 21, 23, and 30, 2005, and December 2, 2005.  Tr. 61-63, 665, 668-69.

Gomez reported left knee pain, occurring three times per week, on December 5, 2005. Tr. 660.  On December 13, 2005, orthopedist and examining physician Dr. William Matthews examined Gomez's left wrist and hip.  Tr. 385-87.   Dr. Matthews stated that conservative treatment was appropriate, and that x-rays would show the extent of necessary further treatment. Tr. 385-386.  Dr. Matthews performed another orthopedic consultation on December 21, 2005,

and again stated that Gomez would probably continue to have unspecified difficulties with his left wrist and hip.  Tr. 495.

On December 22, 2005, Gomez attended a basic recovery class regarding alcoholism. Tr. 645.  A December 28, 2005 knee X-ray showed mild degenerative changes and no evidence of joint diffusion.  Tr. 350.  Gomez attended an alcoholism relapse prevention class on December 30, 2005.  Tr. 639.

### b.    2006

Gomez attended a mental health treatment session on January 3, 2006.  Tr. 469.  Gomez also met with case manager Mowatt on this day.  Tr. 471.  Additionally, Gomez received VA work assignments on January 3 and 10, 2006.  Tr. 473, 635.  Gomez attended group therapy on January 6 and 10, 2006 (Tr. 635, 637), and a sobriety class on January 12, 2006, and January 25, 2006.  Tr. 631, 635.

Hannelie Vermeulen, Licensed Professional Counselor ("L.P.C.), conducted a psychological assessment on January 26, 2006.  Tr. 378-84, 625-30.  Vermeulen diagnosed alcohol and drug abuse in remission, and depression, and assessed a Global Assessment of Functioning ("GAF")[3] score of 65.  Tr. 383, 625.  Vermeulen performed a follow-up psychological examination on January 30, 2006, and made no diagnostic notations.  Tr. 384.  At this time case manager Mowatt certified that Gomez had completed substance abuse treatment

---

[3] The GAF scale is used to report a clinician's judgment of the patient's overall psychological, social and occupational functioning on a scale of 1 to 100.  It does not include impairment in functioning due to physical or environmental limitations.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th Ed., Text Revision, 2002)("*DSM*"), 34.  A GAF score of 61-70 indicates "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning."  *Id.* (emphasis original).

and recommended that he be moved to the VA "community rehabilitation" track.  Tr. 467.

Gomez attended the VA Experiential Learning Program ("ELP") class on February 1, 2006.  Tr. 503, 512.   Gomez again attended ELP classes on February 6, 2006, and February 14, 2006. Tr. 469, 599.  Gomez attended group therapy on February 7 and 8, 14 and 21, 2006.  Tr. 587, 609-10.   On February 15, 2006, Gomez complained to Carrie Natho, R.N.,  of low back, knee, and hip pain, but received no diagnosis or treatment.  Tr. 597.

Kevin Olson, Psychiatric Mental Health Nurse Practitioner ("PMHNP") diagnosed depression and a pain disorder on March 2, 2006.  Tr. 575.  On March 3, 2006, case manager Mowatt noted that Gomez's mental health and medical issues were not on his VA domiciliary treatment plan.  Tr. 467.  Mowatt also discussed Gomez's repeated failure to attend pill line, and suggested Gomez self-administer his medication.  *Id.*  Mowatt cited Gomez's ELP class participation that same day, and noted that Gomez used the workout facilities every morning and the sauna.  Tr. 469.

During March, 2006, Gomez again attended the ELP classes (Tr. 509, 511,521, 531, 537, 559), although psychologist Carol Hayne, Ph.D., noted that had Gomez left the ELP class before it was completed, and was "not motivated" to complete required elements of the program.  Tr. 509, 543.

Gomez attended group therapy on March 14, 2006, and on March 28, 2006, and was assigned diagnoses of alcoholism, polysubstance abuse, depression, an unspecified mood disorder, and tobacco abuse.  Tr. 479, 542.   On March 15, 2006, Gomez complained of bilateral knee pain.  Tr. 541.   Imaging studies of Gomez's knees conducted March 28, 2006, showed bilateral degenerative joint disease (Tr. 374) and Gomez received bilateral knee braces.  Tr. 498.

Gomez met with a vocational rehabiltiation counselor on April 4, 2006, who suggested Gomez apply for VA vocational rehabiltiation benefits and obtain a physical capacity evaluation before he made a vocational rehabiltiation plan.  Tr. 491.  Gomez also met with case manager Mowatt on this date to discuss plans for leaving the VA domiciliary.  Tr. 472.

A lumbar spine x-ray on April 7, 2006, showed mild facet arthrosis at L3-L4 and L5-S1, with moderate degenerative changes at the sacro-illiac joint and mild anterior wedging.  Tr. 348.  Also on April 7, 2006, orthopedist and examining physician Dr. Matthews again performed an evaluation pertaining to Gomez's VA disability benefit application, and assessed a history of back pain, post-surgical right knee pain, and a history left knee pain.  Tr. 802.  Dr. Matthews stated that he expected Gomez to continue experiencing difficulty relating to these impairments, and that Gomez's current conservative treatment was reasonable.  Tr. 803.  Dr. Matthews concluded that Gomez was a "poor candidate for heavy work," and that he would  require light work that was mostly sitting with the ability to change positions frequently as needed for comfort.  *Id.*  Radiology reports for x-rays done on Gomez showed evidence of disk degeneration and facet arthritis of lumbar spine at several levels and left sacroiliac joint with arthritic changes. Tr. 804. [4]

On April 11, 2006, Gomez  underwent a general physical examination with Ronald Stuart, M.D., whose diagnosis included: dysthymia (chronic depression), history of alcohol abuse, degenerative joint disease of back with right sciatica and foot-drop, degenerative joint disease of  both medial compartments of knees, degenerative changes of right hip with internal fixation, fracture of left wrist with ununited scaphoid fracture and degenerative radiocarpal

---

[4] The ALJ attributed this report to Randall Nelson, M.D., the reviewing physician.

joints,  tinea versicolor, nicotine dependency, obesity, numbness of CB dermatome, right upper

extremity, chronic migraine headaches. Tr. 827.   Dr. Stuart indicated that Gomez was "truly

unemployable from multiple orthopedic problems"  accentuated by alcoholism and dysthymia.

Tr. 828.

On April 12, 2006, nurse practitioner Olson diagnosed depression and a pain disorder,

and recommended a change in medication.  Tr. 489.   Hannah Vermeulen, L.P.C., diagnosed

depression and assessed a GAF score of 48[5] on April 18, 2006.  Tr. 486-88.  Gomez also met

with a vocational rehabilitation counselor on this date, and requested information and assistance

regarding vocational rehabiltiation services.   Tr. 488.  Nurse practitioner Olson again met with

Gomez on April 20, 2006, and noted Gomez's reports of suicidal ideation and diagnosed

depression and pain disorder, with a rule-out personality disorder diagnosis.  Tr. 485.

On April 20, 2006, Gomez was examined by psychologist John Louks, who reported that

Gomez was guarded and defiant, made poor eye contact and shifted in his chair frequently due

to physical pain.  He also reported that Gomez had difficulty hearing due to hearing loss, and

that his mood was depressed and angry. Tr. 822.  Dr. Louks diagnosed alcohol dependence in

early remission, cannabis dependence in remission, adjustment disorder with depressed mood

and personality disorder with antisocial and schizoid features.  *Id.*  Dr. Louks indicated a GAF

score of 60.  Tr. 823.   Dr. Louks' assessment was that Gomez had an adjustment disorder with

depressed mood as a result of his physical pain, his mother's death and the consequences of his

personality disorder and his history of chronic alcoholism and marijuana use.  Despite this

---

[5]A GAF score of 41-50 indicates "serious symptoms (e.g. suicidal ideation , severe
obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or
school functioning (e.g. no friends, unable to keep a job)."  *DSM*, 34 (emphasis original).

assessment, Dr. Louks opined that Gomez's depressed mood would not interfere with his ability to work and that working would improve his mood as long as he stayed alcohol and drug free. Tr. 823.

During April and May, 2006, Gomez participated in VA work assignments (Tr. 458, 481), attended water exercise class (Tr. 479), and employment skills training class. Tr. 458.   On May 10, 2006, Gomez met with nurse practitioner Olson for medication management, and reported that his mood was "terrible," but that he was attending swim therapy.  Tr. 478.  Olson continued to diagnose depression, a pain disorder, and a rule-out personality disorder diagnosis, and stated that Gomez showed mild improvement with venlafaxine antidepressant medication. *Id.*

Gomez received a physical capacity evaluation with occupational therapist Danell Hiltz on May 12, 2006.  Tr. 459-62.  Hiltz noted Gomez's daily activity, including swimming three times per week, and found that Gomez demonstrated "fair" form in lifting weights.  Tr. 459. Hiltz also noted that Gomez reported being unable to tie his shoes, but that Gomez picked a bolt up off the floor without assistance.  Tr. 460.  Finally, Hiltz reported that Gomez demonstrated the ability to walk one mile on a treadmill at a steady pace.  Tr. 461.

On June 5, 2006, case manager Mowatt noted Gomez's history of no-shows for appointments and stated that his VRP (vocational rehabilitation program) specialist did not think he was employable due to physical problems.  Tr. 455.  Mowatt stated that Gomez was waiting for his VA and Social Security disability benefits to be approved before discharge from the VA domiciliary.  Tr. 472.

On June 7, 2006, nurse practitioner Olson again diagnosed major depressive disorder

and a pain disorder.  Tr. 454.   Gomez attended group therapy orientation and a group therapy

session on June 12 and 14, 23, and 28, 2006.  Tr. 444-45, 452.

     Case manager Mowatt stated that Gomez's depression was better on July 25, 2006, but

that Gomez "won't acknowledge that it is."  Tr. 463.  Also on this date Mowatt noted that

Gomez reported swimming and going to the gym as part of his sober lifestyle. Tr. 470.  Gomez

received nutrition training on June 29, 2006.  Tr. 442.   Gomez attended a VA pain class on July

12, 2006.  Tr. 438.  Gomez complained of knee pain and received a new cane on July 13, 2006.

Tr. 434-35.  On July 17, 2006, Gomez met with a vocational rehabilitation counselor.  Tr. 439.

     Gomez received employment skills training on July 20 and 21, 2006.  Tr. 446.  Gomez

also completed a VA work assignment  between July 2 and 15, 2006, and July 30 through

August 12, 2006, and a further two week assignment on August 3, 2006.   Tr. 415,26,  432.  On

July 21, 2006, Wendy Hicks, Certified Social Worker ("C.S.W."), wrote that Gomez was

"minimally engaged in [the VA domiciliary] program."  Tr. 431.   On July 24, 2006, Gomez told

his vocational rehabilitation counselor he wanted to obtain a general equivalency degree

("GED").  Tr. 430.  On July 25, 2006, Gomez told case manager Mowatt he had made no

decisions regarding his future and that he was not working.  Tr. 472.  On the same date, Mowatt

noted that Gomez would soon be starting community college classes using the VA vocational

rehabiltiation benefit program.  Tr. 475.  Gomez attended a VA pain class on July 26, 2006.  Tr.

428.

     Gomez attended a VA group therapy meeting on August 2, 2006.  Gomez attended VA

depression and pain management classes on August 4, 9, 11, 21, and 25, 2006.  Tr. 413, 422,

418, 424, 426, 464.   On August 10, 2006, nurse Olson continued to diagnose depression, a pain

18 - FINDINGS AND RECOMMENDATION

disorder, personality disorder "probably paranoid type," and "possibly paranoid disorder." Tr.

421.  Nurse Olson said he suspected that Gomez's personality disorder is the "biggest problem

now." *Id.*

On August 17, 2006, Gomez received a pelvic x-ray afer complaining of extreme pain.

Tr. 347, 416.  This x-ray showed an old fracture with fixation, calcification, sclerosis, and

minimal degenerative changes.  *Id.*  Gomez was fitted for a knee brace on August 31, 2006.  Tr.

412.

On August 25, 2006, case manager Mowatt stated that Gomez was attending three

Alcoholics Anonymous meetings per week and attending a dual diagnosis recovery group

weekly.  Tr. 470.  Gomez attended group therapy for dual diagnosis patients on August 30,

2006.  Tr. 412.   Gomez again attended a VA depression class on September 1, 2006.  Tr. 411.

**B.    Medical Evidence Before the Appeals Council**

**a.    2006**

On November 22, 2006, orthopedist and examining physician Dr. Matthews again

performed a VA disability compensation examination.  Tr. 817-19, 911-13.  Dr. Matthews

diagnosed back pain, and stated, "there is continuing evidence of some lumbar nerve root

irritation on the right."  Tr. 819.  Dr. Matthews also  stated that Gomez's work status  "continues

to be quite poor" but his mental status "seems quite good today."  Tr. 819.[6]

**b.    2007**

On August 9, 2007, Gomez submitted updated VA medical records  (Tr. 808-89), and

---

[6] Dr. Matthews November 22, 2006, opinion was submitted to the Appeals Council.  Tr. 805.  It was apparently not included in the VA records submitted to the ALJ which were printed prior to November 22, 2006.

on December 17, 2007, Gomez submitted additional VA medical records to the Appeals Council. Tr. 906-913.

Gomez continued to complete VA work assignments between April 8 and June 7, 2007. Tr.856, 868, 879, 891. 891.  Gomez attended group therapy, classes, and group recovery meetings between April 23  and May 23, 2007.  Tr. 869, 882, 889.   On April 24, 2007, Gomez reported that he needed a stronger knee brace.  Tr. 892.  Staff physician Dr. Ren performed a physical medicine consult on May 2, 2007, and diagnosed degenerative joint disease of the knees and issued a knee brace.  Tr. 888.   Gomez told social worker Wendy Hicks that he had increased pain on May 14, 2007, due to moving his belongings within the VA domiciliary.  Tr. 877.

On April 26, 2007, psychiatric nurse practitioner Kevan Olson assessed Gomez with depressive disorder, pain disorder associated with psychological factors and medical condition, and personality disorder not much helped with medications. Tr. 848.

Nurse Celeste Marokus met with Gomez on May 10, 2007, for a brief therapy session. Tr. 879.  On May 15, 2007, Gomez reported to Marokus that he had pain along the right side of his body, and that he either took pain medication or laid down to control this pain.  Tr. 873. Gomez also reported minimizing movement to control his pain.  *Id.*   On May 16, 2007, nurse practitioner Olson again met with Gomez for medication management and psychotherapy.  Tr. 875.  Olson diagnosed depression, a pain disorder, and a personality disorder, stating that the personality disorder was the "biggest issue."  Tr. 875.  Gomez reported to a nurse that he needed

to lie down due to pain on May 17, 2007.  Tr. 873.  Olson assessed a GAF of 60[7] on this date.

*Id.*

Gomez failed to attend pill line on June 6 and 7, 2007.  Tr. 854-55.  He told social

worker Wendy Hick that he missed pill line due to sleeping problems.  Tr. 853.  Gomez

attended group therapy on June 14, 2007, and stated that "God made a mistake" by letting him

survive his January 10, 2005 automobile accident.  Tr. 851.

A clinical dietician, Pam Turman, diagnosed Gomez with hypersomnia on June 12,

2007.  Tr. 881-82.  Turman counseled Gomez to reduce his weight through dietary changes.  Tr.

882.

On June 14, 2007, Gomez reported a "panic attack" to nurse Olson, who again assessed

depression and a pain disorder and stated that Gomez was not delusional.  Tr. 848.  Gomez also

participated in group therapy on that date.  Tr. 851.

On June 26, 2007, spinal imaging studies showed minimal degenerative change in the

lumbar spine, slight decreased height at T-10, T-11, and T-12, with moderate degenerative

changes and no evidence of fracture, and degenerative changes in the left sacroiliac joints.  Tr.

811.  Olson, met with Gomez for medication management and therapy on July 31, 2007, and

continued his diagnoses of depression and a pain disorder.  Tr. 834-36.  Olson noted Gomez's

reported suicidal ideation (Tr. 835) and assessed a GAF of 45[8] as of June 26, 2007.  Tr. 834.

On November 13, 2007,  orthopedist and examining physician Dr. Matthews again

---

[7]A GAF of 51-60 indicates "moderate symptoms . . . OR moderate difficulty in social
occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers).  *DSM*,
34 (emphasis original).

[8]See note 3.

evaluated Gomez in conjunction with his request for an increase in his VA disability rating.  Tr.

908-11.  Dr. Matthews diagnosed chronic back pain involving the entire thoracic and lumbar

spine, and chronic pain in both knees due to previous surgery and arthritis with loss of motion in

each knee due to posttraumatic degenerative arthritis.  Tr. 909-10.   Back and knee symptoms

were probably worsened by chronic tension and/or depression.  Tr. 910.   Gomez's prognosis

included continued back and knee difficulty.   Dr. Matthews commented that  Gomez's working

capacity is considerably reduced by multiple orthopedic problems as well as by chronic mental

distress and  stated that, "Considering his multiple problems, his mental distress and his age, it

might be best to think of him as having permanent and total disability."  Tr. 910.

## DISABILITY ANALYSIS

The Commissioner engages in a sequential process encompassing between one and five

steps in determining disability under the meaning of the Act.  20 C.F.R. §§ 404.1520; 416.920;

*Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.

If he is, the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i); 416.920(a)(4)(i).  At step

two, the ALJ determines if the claimant has "a severe medically determinable physical or mental

impairment" that meets the twelve-month durational requirement.  20 C.F.R. §§ 404.1509;

404.1520(a)(4)(ii); 416.909, 416.920(a)(4)(ii).  If the claimant does not have such a severe

impairment, he is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals a

"listed" impairment in the regulations.  20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii).  If

the impairment is determined to equal a listed impairment, the claimant is disabled.

If adjudication proceeds beyond step three the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite limitations imposed by his impairments. 20 C.F.R. §§ 404.1520(e); 416.920(e); Social Security Ruling ("SSR") 96-8p.

The ALJ uses this information to determine if the claimant can perform his past relevant work at step four. 20 C.F.R. §§ 404.1520(a)(4)(iv); 416.920(a)(4)(iv). If the claimant can perform his past relevant work, he is not disabled. If the ALJ finds that the claimant's RFC precludes performance of his past relevant work the ALJ proceeds to step five.

At step five the Commissioner must determine if the claimant is capable of performing work existing in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v); 404.1520(f); 416.920(a)(4)(v); 416.920(f); *Yuckert*, 482 U.S. at 142; *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999). If the claimant cannot perform such work, he is disabled. *Id.*

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F.3d at 1098. If the process reaches the fifth step, the burden shifts to the Commissioner to show that "the claimant can perform some other work that exists in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id.* at 1100. If the Commissioner meets this burden the claimant is not disabled. 20 C.F.R. §§ 404.1520(g); 404.1566; 416.920(g); 416.966.

///

23 - FINDINGS AND RECOMMENDATION

## THE ALJ'S FINDINGS

The ALJ found that Gomez had not engaged in substantial gainful activity at step one in the sequential proceedings.  At step two, the ALJ identified "severe" impairments:  "multiple traumatic injuries with right hip fracture, status-post open reduction internal fixation (ORIF); left wrist fracture; degenerative joint disease of both knees; obesity; and degenerative disc disease."  Tr. 20.  The ALJ found that Gomez retained the following RFC:

> He is able to lift and carry 20 pounds occasionally and 10 pounds frequently; he can lift only very small items with the left upper extremity.  He has difficulty bending or twisting the left wrist.  He can be on his feet for 15 minutes at a time, and sit 20 minutes at a time; he needs an opportunity to change positions.  He uses a cane to walk.  He can climb stairs only rarely.  He can stoop or crouch occasionally, and he cannot kneel or crawl.

Tr. 21.  The ALJ found that Gomez could not perform his past relevant work, and found that Gomez could perform other work in the national economy at step five.  Tr. 23.  The ALJ therefore found Gomez not disabled.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Batson v. Commissioner for Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir. 2004).  "Substantial evidence" means "more than a mere scintilla, but less than a preponderance."  *Bray v. Comm'r of the Soc. Sec. Admin*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)(citing *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)).  The reviewing court may not substitute its judgment for that of the Commissioner. *Id.* (citing *Robbins v. Social Security Administration*, 466 F.3d 880, 882 (9th Cir. 2006)), *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Id.*, *see also Batson*, 359 F.3d at 1193.

## ANALYSIS

Gomez alleges that the ALJ failed to provide adequate reasons for finding him not credible, and failed to appropriately assess a VA finding of partial disability.  Gomez also asserts that there is not substantial evidence in the record to support the ALJ's decision and that the ALJ's RFC assessment establishes that he is disabled under the Commissioner's medical-vocational guidelines at step five in the sequential proceedings.

## I.    Credibility

Gomez challenges the ALJ's evaluation of his credibility.  Gomez asserts that the ALJ should have provided "specific" reasons for rejecting his testimony, but points to no individually erroneous finding by the ALJ or testimony establishing work-related limitations.  Pl.'s Opening Br. 17-18.

### A.    Standards: Credibility

Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent a finding of malingering, the ALJ must

provide "clear and convincing" reasons for finding a claimant not credible. *Lingenfelter,* 504

F.3d at 1036  (citing *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)).  The ALJ's

credibility findings must be "sufficiently specific to permit the reviewing court to conclude that

the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748,

750 (9th Cir. 1995) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (en banc)).

The ALJ may consider objective medical evidence and the claimant's treatment history, as well

as the claimant's daily activities, work record, and observations of physicians and third parties

with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F.3d at 1284; *see*

also SSR 96-7p at *3 (available at 1996 WL 374186).  The ALJ may additionally employ

ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding

symptoms by the claimant. *Smolen*, 80 F.3d at 1284.  Once a claimant establishes an

impairment, the ALJ may not, however, make a negative credibility finding "solely because" the

claimant's symptom testimony "is not substantiated affirmatively by objective medical

evidence." *Robbins*, 466 F.3d at 883.

### B.      Analysis: Credibility

Without making a clearly identifiable credibility analysis, the ALJ concluded that

Gomez's statements concerning the intensity, persistence, and limiting effects of his symptoms

were "not fairly credible."  Tr. 21.  The ALJ's subsequent discussion cites Gomez's medical

record and activities of daily living.  Tr. 22.  Gomez does not challenge the ALJ's findings

regarding his medical record and activities of daily living so far as they pertain to his credibility.

Gomez asserts that the ALJ should have provided specific reasons for rejecting specific

26 - FINDINGS AND RECOMMENDATION

symptom testimony.  Pl.'s Opening Br. 17.  The ALJ may base his credibility findings upon

numerous factors, including a claimant's medical record and activities of daily living, but the

ALJ must make some correlation between these findings and his credibility conclusion.

*Doddrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). Here, the ALJ failed to make such

correlations.  The ALJ did not state what elements of Gomez's testimony are not credible, and

the ALJ did not clearly state what evidence supported his finding that Gomez was not credible.

This analysis contravenes the ALJ's duty to make particular credibility findings and should not

be sustained.

The Commissioner now asserts that the medical record, in conjunction with Gomez's

reported activities of daily living, supports the ALJ's credibility determination.  Def.'s Br. 4.

I find this submission unpersuasive in light of the ALJ's failure to establish specific correlations

between the medical record and the ALJ's credibility conclusion.

In summary, the ALJ's credibility findings should not be sustained.  The effects of this

error are discussed below.

## II.    Medical Source Statements

Gomez asserts that the November 22, 2006, and November 13, 2007, opinions of

examining physician Dr. Matthews and the April 26, 2006, and July 31, 2007, opinions of

treating psychiatric nurse practitioner Olson support his disability claim.  Pl.'s Opening Br. 15-

16., Tr. 911, 908, 848, 834.  Gomez submitted both opinions to the Appeals Council on August

9, 2007, four months after his April 13, 2007, hearing before the ALJ.  Tr. 805.  Gomez does not

directly challenge the ALJ's analysis of the medical evidence pertaining to the period in the

record before the ALJ's decision.  Gomez indicates his medical history in his recitation of the

record, Pl.'s Opening Br. 2-7, but his arguments do not simply rely upon the ALJ's evaluation of

his medical record.  *Id.* at 10-15, 17-18.

### A.    Standards: Medical Source Statements

Disability opinions are reserved for the Commissioner.  20 C.F.R. §§ 404.1527(e)(1),

416.927(e)(1).  However, when making that determination, the ALJ generally must accord

greater weight to the opinion of a treating physician than that of an examining physician.  *Lester*

*v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  The ALJ must also generally give greater weight to

the opinion of an examining physician over that of a reviewing physician.  *Id.*  If two opinions

conflict, an ALJ must give "specific and legitimate reasons" for discrediting a treating physician

in favor of an examining physician.  *Id.* at 830.  The ALJ may reject physician opinions that are

"brief, conclusory, and inadequately supported by clinical findings."  *Bayliss v. Barnhart*, 427

F.3d 1211, 1216 (9th Cir. 2005).  In addition, the ALJ must ordinarily give greater weight to

opinions rendered by specialists.  20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5).

The reviewing court may consider evidence submitted to the Appeals Council.

*Harman*, 211 F.3d 1180.  However, to justify a remand for benefits or further proceedings,

Gomez must show that additional evidence submitted to the Appeals Council is (1) new and not

merely cumulative of what is already in the record; (2) material; and (3) the claimant provides

good cause for failing to submit such evidence earlier.  42 U.S.C. § 405(g); *Mayes v. Massinari*,

276 F.3d 453, 462-63 (9th Cir. 2001).  Evidence is "material" when it "relates to the period on

or before the date of the Administrative Law Judge hearing," 20 C.F.R. § 404.970, 416.1470, or

bears "directly and substantially on the matter in dispute." *Mayes*, 276 F.3d 462-63 (quoting

*Ward v. Schweiker*, 686 F.2d 762, 764 (9th Cir. 1982)).  A claimant may not submit new

evidence merely because it is more favorable to the claimant. *Id.* at 463.

### B.    Analysis: Medical Source Statements

### a.    Examining Orthopedist Dr. Matthews

Orthopedist Dr. Matthews examined Gomez on April 7, 2006, and on November 22,

2006, in conjunction with Gomez's application for an increase in his VA disability rating.  Tr.

800-04, 817-19.  The April 2006 examination was included in the medical records submitted to

the ALJ at his February 7, 2007, hearing.  The November, 2006 examination was included in the

records submitted to the Appeals Council as was Dr. Matthews' November 13, 2007 report. [9] Tr.

817, 908.   In the November, 2006, examination report, Dr. Matthews noted Gomez could not

do his prior building maintenance work due to "problems at left wrist, back, and both knees."

Tr. 817.  Dr. Matthews also noted that Gomez was somewhat overweight, with average muscle

condition, good cooperation, and a limp stemming from his right hip and right knee.  Tr. 817.

Dr. Matthews performed a spinal examination and found that Gomez could perform various

motions, but that they increased his reported pain.  *Id.*  Dr. Matthews found Gomez's knee

motion decreased and noted that Gomez reported that both knees were painful with movement.

Tr. 817.  Dr. Matthews cited April 2006 x-rays showing spinal "disc degeneration at multiple

levels" and December 2005 x-rays showing bilateral degenerative arthritis of the knees.  Tr. 818.

In conclusion, Dr. Matthews diagnosed (1) back pain over the entire back, worse at the low

---

[9] The VA records before the ALJ were printed prior to the November, 2006 examination.

back, diagnosed as chronic muscular strain superimposed on degenerative instability, with "continuing evidence of some lumbar nerve root irritation on the right," (2) post-surgical right knee pain and collapsing with related post-traumatic degenerative arthritis, and (3) left knee pain and collapsing with post-traumatic degenerative arthritis. *Id.*

Dr. Matthews stated that Gomez's conservative treatment remained reasonable. *Id.* Dr. Matthews opined that Gomez is a "poor candidate" for heavy work, but stated that he is limited to "light work." *Id.* Dr. Matthews additionally said, "The work needs to be mostly sitting. He needs to be able to change positions as needed for comfort. He might need to lay down occasionally for comfort." *Id.* Finally, regarding Gomez's wrist, Dr. Matthews said, "residuals of right[10] wrist fracture make high production work impossible with the upper extremities." *Id.* Dr. Matthews concluded, "limitations involve wrist, back and knee problems as well as right hip pain." *Id.* Dr. Matthews finally said that Gomez does not require bed rest and "has not had total incapacity in the past year." *Id.*

Dr. Matthews examined Gomez again on November 13, 2007, also in conjunction with a subsequent application Gomez filed for an increase in his VA disability benefits. Tr. 908-11. Dr. Matthews stated that Gomez was utilizing the same treatment as in November 2006, and was using a cane. Tr. 908. Gomez reported "special exercising" and the ability to sit comfortably for fifteen minutes and walk for about ten minutes. *Id.* Dr. Matthews conducted an examination and concluded that Gomez had chronic back pain involving his thoracic and lumbar spine, which he described as chronic muscular strain superimposed on degenerative

---

[10]All other medical records indicate a left wrist fracture; Dr. Matthews reference to a right wrist fracture presumably reflects a typographical error.

instability.  Tr. 910-11.   Dr. Matthews also concluded that Gomez continued to have chronic

bilateral knee pain with arthritis in both knees.  Tr. 910.  Dr. Matthews concluded:

> Working capacity is considerably reduced by multiple orthopedic
> problems, as well as by chronic mental distress.  He is limited to
> very light types of work and this has already been discussed in my
> report of April 2006.  Work limitation is for multiple reasons,
> especially back and knees.  His work needs to be very light.  He
> needs to change positions as need for comfort.  He needs to be able
> to lie down occasionally for comfort.  Upper extremity problems
> limit his ability to do manual activities.  Considering his multiple
> problems, his mental distress, and his age, it might be best to think
> of him as having permanent and total disability.

Tr. 910.

Neither the November, 2006 opinion nor the November 2007 opinion of Dr. Matthews

was before the ALJ.  However, the reviewing court may consider evidence before the Appeals

Council.  *Harman*, 211 F.3d 1180.  The evidence before the Appeals Council is material and not

merely cumulative.  The evidence bears directly and substantially on Gomez's claim of

disability.  Gomez correctly asserts that Dr. Matthews's opinions supports his disability claim.

Dr. Matthews November 2006 opinion is supported by imaging studies showing degenerative

and traumatic arthritis and is consistent with Gomez's testified limitations.  Dr. Matthews

November, 2007 opinion is also consistent with Gomez's testified limitations.  The effects of

crediting Dr. Matthews's opinions are discussed below.

### b.    Nurse Practitioner Olson

Gomez also asserts that nurse practitioner Olson's April 26, 2007, opinion supports his

allegation of disability.  Pl.'s Opening Br. 16.  Nurse practitioners are not "acceptable medical

sources" under the Commissioner's regulations, and as such, may not make diagnoses

establishing the existence of an impairment.  20 C.F.R. §§ 404.1513(a), 404.1513(d),

416.913(a), 416.913(d).  However, the regulations designate nurse practitioners as "other"

sources who may demonstrate the severity of a claimant's medically established impairment and

how it affects a claimant's ability to work.  20 C.F.R. §§ 404.913(d)(1), 416.913(d)(1).

Furthermore, "a nurse practitioner working in conjunction with a physician constitutes an

acceptable medical source, while a nurse practitioner working on his or her own does not."

*Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996).

Olson provided medication management and supportive psychotherapy for Gomez

between March 2006 (Tr. 575) and July 31, 2007 (Tr. 834-36), diagnosing depression, a pain

disorder, and a rule-out personality disorder throughout this period.  On April 26, 2007, Olson

noted that Gomez continued to miss pill line, and opined that Gomez suffered from a personality

disorder rather than delusions.  Tr. 848.  Olson also noted medication recommendations by a

physician, Dr. Mebane.  *Id.*  Olson's mental status examination report on that date noted that

Gomez was "mildly irritable," with constricted affect, "some vague suicidal ideation recently,

denies current suicide ideation," and "sort of glaring eye contact."  *Id.*  Olson diagnosed

depressive disorder, pain disorder associated with both psychological factors and a general

medical condition, personality disorder, and passive aggressive tendencies.  *Id.*  Olson stated

that Gomez was not presently an acute suicide risk, but that Gomez reported that this changes

from moment to moment.  Tr. 848-49.  Olson assessed a GAF of 48[11] as of June 19, 2007.  Tr.

849.  Finally, on July 31, 2007, Olson noted Gomez's reported suicidal ideation and assessed a

---

[11]See note 3.

GAF of 45.[12]  Tr. 834-35.

As noted, this court may consider evidence before the Appeals Council.  *Harman*, 211 F.3d 1180.  Gomez again correctly asserts that Olson's opinion supports his claim regarding the severity of his mental impairment and his functioning level.  Olson's GAF assessment of 48 is consistent with "serious symptoms" or "any serious impairment in social, occupational, or school functioning."  *DSM*, 34.  The court considers the effects of crediting Olson's opinion below.

### III.    Veteran's Administration Disability Finding

Gomez argues that, while the ALJ correctly stated the law regarding the VA finding that he was disabled, the ALJ did not correctly apply the law.  Pl.'s Opening Br. 13.  Prior to the ALJ's April 2007 decision, on June 8, 2006, the VA awarded Gomez ten percent VA disability ratings for, respectively, Gomez's right knee, left knee, and low back impairments.  Tr. 69. These ratings amounted to a thirty-percent disability finding under the VA disability ratings system.  *Id.*  The VA also granted Gomez eligibility for a non-service connected pension.  *Id.*

### A.      Standard: Veteran's Administration Disability Findings

The Social Security Administration is not bound by another agency's disability determination.  20 C.F.R. §§ 404.1504; 416.904.      However, while the ALJ is not bound by the VA's disability ratings, he must carefully consider them.  *McCartey v. Massinari*, 298 F.3d 1072, 1076 (9th Cir. 2002).  Before an ALJ may reject VA findings he must give "persuasive, specific, valid reasons for doing so that are supported by the record."  *Id.*

---

[12]*Ibid.*

### B.        Analysis: Veteran's Administration Disability Finding

The ALJ noted the VA's June 2006 award, and stated that he gave it "great weight."  Tr.

22.  The ALJ found that Gomez presently has "some limitations" consistent with the VA's

disability findings, but found the VA conclusion that Gomez cannot sustain employment

unsupported by the medical and evidentiary record pertaining to Gomez's present disability

application.  Tr. 23.

The ALJ found that the record before him supported the VA limitations relating to

Gomez's physical impairments, but did not support the VA findings regarding Gomez's mental

impairments.  Tr. 23.  The record before this court shows that Gomez suffered from depression

and intermittent suicidal ideation throughout most of the period under review.  The ALJ's

rejection of the VA disability finding as it pertains to Gomez's mental impairments is not based

upon the record and therefore should not be sustained.

## IV.    The ALJ's Step Five Findings

Finally, Gomez asserts that the ALJ's findings that he can perform work in the national

economy is not based upon substantial evidence or the correct legal standards.  Pl.'s Opening

Br. 10-13.  Gomez challenges both the ALJ's use of a vocational expert and his reliance upon

the Commissioner's Medical-Vocational Guidelines.

### A.        Vocational Expert's Testimony

At step five, the ALJ may draw upon a vocational expert's testimony to show that

claimant can perform work in the national economy.  *Tackett*, 180 F.3d at 1101.  The ALJ's

questions to the vocational expert must include all properly supported limitations.  *Osenbrock v.*

*Apfel*, 240 F3.d 1157, 1165 (9th Cir 2001). Here, the ALJ propounded hypothetical questions to the vocational expert based upon an RFC assessment which did not properly consider limitations described in Gomez's testimony and the medical evidence. Tr. 934. The ALJ specifically omitted reference to Gomez's use of a cane in combination with his impaired left hand and need to sit or stand in the course of eight hours. *Id.* The vocational expert's testimony is therefore without probative value. The ALJ's step five findings should not be sustained so far as they are based upon the vocational expert's testimony.

**B.      Medical-Vocational Guidelines**

Gomez also argues that the ALJ's RFC, as written, establishes that he is limited to sedentary work, and that he is therefore disabled under the Commissioner's Medical-Vocational Guidelines. Pl.'s Opening Br. 11. The ALJ's RFC restricted Gomez to occasionally lifting and carrying twenty pounds and frequently lifting and carrying ten pounds, and included "difficulty" bending or twisting the left wrist, fifteen minutes standing at one time, twenty minutes sitting at one time, an opportunity to change positions, use of a cane for walking, rare stair climbing, occasional stooping or crouching, and no kneeling or crawling. Tr. 21.

Under the Commissioner's regulations, light work "involves lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b); 416.967(b). If a claimant has limited use of an upper extremity, the occupational base pertaining to light work is eroded. SSR 83-12 at 4 (available at 1983 WL 31251). However, the Commissioner considers "loss of use of an upper extremity" to require loss of the use of an arm or hand "because of amputation, paralysis, etc." *Id.* Sedentary work

"involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles . . . . Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. §§ 404.1567(a); 416.967(a).

The ALJ's lifting restrictions, limiting Gomez to, respectively, occasional lifting and carrying of twenty pounds with frequent lifting and carrying of ten pounds, represent light work under the Commissioner's regulations. 20 C.F.R. §§ 404.1567(b); 416.967(b). However, the ALJ's subsequent limitations eroded the light work occupational base. This reduction does not mandate a sedentary work finding, but in such circumstances, the Commissioner instructs that it is "advisable" that the ALJ consult a vocational expert. SSR 83-12 at *2. Furthermore, the ALJ may not rely upon the Medical-Vocational Guidelines when they do not represent the "*full range* of jobs in a given category, i.e., sedentary work, light work, or medium work." *Tackett*, 180 F.3d at 1101 (emphasis original). In these cases, the ALJ should call a vocational expert. *Id.* The ALJ *must* also call a vocational expert when a claimant has a non-exertional impairment. *Id.* at 1102.

Because the ALJ limited Gomez to work falling between the medical vocational guidelines for light and sedentary work, and because Gomez's mental impairments represent a nonexertional impairment, the ALJ was obligated to call a vocational expert in making his step five findings. Because the vocational expert's testimony establishes that Gomez is disabled, as discussed below, this court need not make further determinations regarding the applicability of the grids to Gomez's RFC.

## V.      Remand

### A.      Standard for Remand

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000) (*cert denied*, 531 U.S. 1038 (2000)). The issue turns on the utility of further proceedings.

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where: "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Harman,* 211 F.3d at 1178 (quoting *Smolen,* 80 F.3d at 1292). In such circumstances the reviewing court must credit the improperly rejected evidence. *Vasquez v. Astrue*, 547 F.3d 1101, 1106-07 (9th Cir. 2008) (*en banc review denied*, 572 F.3d 586 (9th Cir. 2009)). It is axiomatic, however, that the reviewing court may not credit testimony and subsequently award benefits contrary to the Act. *See Vasquez*, 572 F.3d at 589 (O'Scannlain J., dissenting).

### B.      Remand Analysis

The ALJ failed to properly evaluate Gomez's testimony and the VA disability opinion. Though the ALJ did not have an opportunity to review the 2007 opinions of Dr. Matthews and Nurse Olson, these opinions constitute part of the record before this court and support a finding of disability. In such circumstances, the improperly rejected evidence should be credited. *Hammock v. Bowen*, 879 F.2d 498, 502 (9th Cir. 1989).

In determining whether to award benefits or remand the matter for further proceedings the court must determine whether "outstanding issues remain in the record" under the second *Harman* prong. *Harman*, 211 F.3d at 1178. Neither party asserts that the record requires development, and this court finds the record sufficient.

Therefore the court must determine whether the record clearly requires award of benefits after the disputed evidence is credited. *Harman*, 211 F.3d at 1178. Gomez testified that he could not lift or turn with his left hand (Tr. 927), sit more than twenty minutes (Tr. 928), and that he required a cane. Tr. 922. Dr. Matthew opined that, as of November 27, 2006, Gomez may perform limited light work (Tr. 913) and, as of November 13, 2007, Gomez additionally required an opportunity to recline as pain dictates, but that "it might be best to think of him as having a permanent and total disability." Tr. 910. Nurse practitioner Olson additionally stated that Gomez experienced depression, suicidal ideation and clinical features consistent with a personality disorder. Tr. 834-37, 848. The vocational expert at Gomez's February 9, 2007, hearing testified that an individual who required a sit/stand option, no handling of less than five pounds with the left hand, and the use of a cane for support when standing, would be unable to sustain employment. Tr. 937. Because the credited testimony establishes that Gomez has these limitations, the vocational expert's testimony establishes that Gomez may not perform work in the national economy at step five in the sequential proceedings. Consequently, Gomez is disabled under the Commissioner's regulations.

## CONCLUSION AND RECOMMENDATION

The ALJ's decision is not based upon the appropriate legal standards or substantial

evidence.  Crediting the improperly assessed testimony establishes that Gomez is disabled under Titles II and XVI of the Act.  The ALJ's decision should therefore be reversed and remanded for the immediate calculation and award of benefits.

## **SCHEDULING ORDER**

The above Findings and Recommendation are referred to a United States District Judge for review.  Objections, if any, are due September 22, 2010.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If objections are filed, any party may file a response fourteen days after the date objections are filed. Review of the Findings and Recommendation will go under advisement when the response is due or filed, whichever date is earlier.

IT IS SO ORDERED.

DATED this 8th day of September, 2010.

 s/ Patricia Sullivan
Patricia Sullivan
United States Magistrate Judge

39 - FINDINGS AND RECOMMENDATION